IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        v.                               24-CR-60-LJV

GREGORY TROTTER,

           Defendants.

## GOVERNMENT'S PRETRIAL MEMORANDUM

THE UNITED STATES OF AMERICA, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and Douglas A. C. Penrose and Evan K. Glaberson, Assistant United States Attorneys, hereby submits its Pretrial Memorandum in accordance with this Court's Pretrial Order.

## I.      INTRODUCTION

This memorandum is provided in compliance with the Court's Pretrial Order.  See Dkt. No. 44.  It contains briefing on the facts that the government intends on proving at trial as well as evidentiary issues likely to arise along with the applicable authority the government submits should guide the Court in its evidentiary rulings.  The government reserves its right to supplement this memorandum and/or to respond to any evidentiary issues raised by the defendant.

## II.      STATEMENT OF THE CASE AND SUMMARY OF CHARGES

The Indictment charges that Gregory TROTTER, while employed as a detective with the Amherst Police Department ("APD"), made a series of materially false statements to the

Federal Bureau of Investigation ("FBI") during a voluntary interview that took place on September 30, 2022. The interview was conducted as part of the investigation of Peter Gerace, the owner of Pharaoh's Gentlemen's Club ("PGC"), a local strip club. Gerace was charged by indictment in February 2021 with violating various federal statutes, including bribing public officials, distributing narcotics, and engaging in a conspiracy to commit sex trafficking by force, fraud or coercion. The FBI learned that TROTTER had both a personal and professional relationship with Gerace and sought to interview him about that relationship. The FBI was aware that the TROTTER-Gerace relationship appeared consistent with Gerace's practice of cultivating relationships with members of law enforcement in order to improperly leverage those relationships to his advantage.

During the interview on September 30, 2022, TROTTER was questioned about his relationship with Gerace and about TROTTER's role investigating the theft of a Rolex watch from Gerace's home in 2019 by an ex-girlfriend. Throughout the interview, TROTTER covered up and minimized his relationship with Gerace and knowingly and willfully made numerous false statements, all of which were material to the ongoing federal investigation of Gerace, including: (1) TROTTER denied having contact with Gerace after January 2017; (2) TROTTER stated that his involvement in the investigation into the theft of the Rolex watch was limited to taking a statement from Gerace; and (3) TROTTER stated that Gerace had never reached out to him or contacted him regarding the investigation into the Rolex watch. Each of these statements, as TROTTER then and there well knew, were false.

### III.     **STATEMENT OF FACTS**[1]

A.  The Gerace/PGC Investigation

The evidence will establish that by approximately April 2019, when TROTTER was investigating the theft of Gerace's Rolex watch, agents with the FBI and HSI were investigating drug trafficking and sex trafficking activities in and around PGC.  Specifically, agents had evidence that Gerace, the owner of PGC, and his associates distributed cocaine at PGC, PGC dancers engaged in commercial sex acts at PGC, Gerace provided drugs or money to PGC dancers who engaged in commercial sex acts, and that Gerace also brought PGC dancers to his home to engage in commercial sex acts.  In addition, agents developed information that Gerace sought out and used relationships with law enforcement officers and public officials to protect and insulate his drug and sex trafficking operation at PGC.  For example, agents had evidence that Gerace paid former DEA Agent Joseph Bongiovanni for protection and information and that pursuant to this arrangement, Bongiovanni worked to shield Gerace from investigation, provide Gerace with advice, and give Gerace law enforcement sensitive information. During the investigation, agents also learned that Gerace told dancers at PGC, including women he coerced into commercial sex acts, that he was "untouchable."

As part of this investigation, HSI Special Agent Curtis Ryan will testify that he interviewed Phlycia Hunt at the Amherst Police Department ("APD") station following her arrest on April 9, 2019.  As discussed further below, SA Ryan will testify about how the information provided by Hunt related to the ongoing Gerace investigation.

---

[1] The government anticipates the proof at trial will show the facts summarized below. This summary is provided for the purpose of anticipating evidentiary issues and assisting the Court and the parties in conducting the trial efficiently. This summary should not limit, restrict, or estop the government's overall proof at trial.

SA Ryan and FBI Special Agent Brian Burns will testify regarding the progression of the investigation following Hunt's arrest.  In particular, HSI SA Ryan will testify about the seizure of Gerace's cellphone in April 2019 and the subsequent review of records from the phone, as well as the execution of a federal search warrant at Gerace's residence in December 2019.  Records from Gerace's cellphone show extensive contacts with public officials and members of law enforcement, including TROTTER (discussed below).  TROTTER'S business card was found in Gerace's master bedroom during the search of his house in December 2019.  SA Ryan and SA Burns will testify how the evidence, including the information provided by Hunt, impacted the investigation of Gerace and the investigation of Gerace's relationship with TROTTER.

SA Ryan and SA Burns will testify that the investigation into Gerace continued from 2019 and was still ongoing as of September 30, 2022, when TROTTER was interviewed by the FBI.  In particular, a federal indictment was returned against former DEA Agent Joseph Bongiovanni in October 2019, referencing Gerace as unindicted co-conspirator-1.  In the indictment, Bongiovanni was charged with conspiracy, obstruction, and lying to federal agents for, among other things, falsely denying and covering up his relationship with co-conspirator-1, *i.e.*, Gerace.  The indictment of Bongiovanni and the subsequent searches of PGC and Gerace's residence in December 2019 received significant coverage in the media.

In February 2021, Gerace was indicted and charged, along with Bongiovanni, with conspiracy to defraud the United States and conspiracy to distribute controlled substances. Gerace was also indicted and charged with maintaining a drug involved premises at PGC, and conspiracy to commit sex trafficking by force, fraud and coercion, and related offenses. Again, there was significant media coverage of this indictment, including front page articles in the Buffalo News and other local outlets.

4

After February 2021, federal agents continued to investigate the crimes committed by Gerace and Bongiovanni and continued to learn of and seek out additional potential witnesses to their activities.

B.  TROTTER'S Relationship with Gerace in 2016

In 2016, TROTTER, who was in the APD's Family Offense Unit, was assigned to handle a domestic violence case involving Gerace and his then wife.  From July 2016 through mid-2017, TROTTER had regular contact with Gerace related to these complaints and subsequent charges that were filed against Gerace's then wife.  During this period, Gerace informed an associate that TROTTER helped get Gerace an order of protection against the ex-wife and that TROTTER was a "great guy" who "took great care of me." As of mid-2017, the domestic violence cases involving Gerace as a witness/victim were closed and there was no case-related professional reason for TROTTER to be in contact with Gerace.

C.  TROTTER'S Relationship with Gerace in 2018

 Between mid-2017 and March 2019, TROTTER continued to communicate with Gerace in a personal capacity.  These communications included invitations to various social events.  In May 2018, Gerace, using his cell phone number ending -1931, sent the following text message to TROTTER'S APD work cell phone number ending -4682:



On June 4, 2018, Gerace invited TROTTER to a "free pig roast for friends and family" scheduled for June 9, 2018 at 4 pm at PGC.  On June 8, 2019, TROTTER responded and asked Gerace for "a number for" a local judge.  Gerace responded with the local judge's number, and then stated, "Hope to see you tomorrow 4 PM pig roast."  TROTTER responded with:



Detective Jeffrey Gilbert, an APD colleague of TROTTER'S, will testify that he recalls being with TROTTER off-duty at the East Aurora Music Festival (scheduled for June 9, 2018) when TROTTER suggested that the two attend a barbeque at PGC.  Gilbert will testify that he attended the barbeque with TROTTER, that he saw the local Judge at the PGC

party, that the party appeared to be invite only, and that there were "scantily clad women serving food."    Gilbert will testify that he and TROTTER stayed at the party for approximately 15 to 30 minutes.

On September 18, 2018, Gerace sent a photo of a flier to TROTTER's APD cell phone ending -4682 with an invitation to PGC's 13th Anniversary party to be held on September 19, 2018 at 5 pm.  TROTTER did not respond.


D. <u>2018 – 2019: TROTTER Directs Gerace to Communicate Using TROTTER's Personal Cellphone and to "Dump" the APD cell phone number</u>

On December 20, 2018, TROTTER began communicating with Gerace using TROTTER'S personal cell phone (ending -8303) and stopped communicating with Gerace using his department-issued APD cell phone.  The first message from TROTTER to Gerace was initiated by TROTTER as follows:



Greg Trotter (+17165738303)                              ☐ Received
                                                        12/20/2018 9:03:20 PM
It's Trotter. I talked to Sliwa yesterday. Thanks for the invite but unfortunately I have to work till 11pm tonight.

The "invite" referred to a PGC Christmas party.  After TROTTER contacted Gerace using his personal cell phone number for the first time, the two exchanged messages about getting together for a "holiday drink."  Gerace then asked TROTTER if he should "get rid of the other phone number," referring to TROTTER'S APD-issued phone number, to which TROTTER replied:

> **Greg Trotter (+17165738303)**          □ Received
> Yeah, dump it                            12/20/2018 9:32:21 PM

In January 2019, Gerace referenced TROTTER in a conversation with another individual, saying that he and TROTTER "get together once in a while and grab a couple [drinks]." During January 2019, Gerace sent messages to TROTTER's personal cellphone in which he suggested the two of them needed to get together, to which TROTTER responded:

> **Greg Trotter (+17165738303)**                      □ Received
>                                                       1/25/2019 9:54:38 PM
> Hey buddy. Sorry forgot to text back the other day. Let's make this happen soon.
> I'm working nights next week, so probably the following week

### E.  The Phlycia Hunt Investigation and Arrest

As stated above, in March 2019, Gerace filed a police report with APD alleging that Phlycia Hunt had stolen Gerace's Rolex watch.  The evidence will show that between March 2019 and mid-April 2019, TROTTER played a substantial role investigating the theft of this watch.

TROTTER was communicating with Gerace even before Gerace filed the initial report with APD.  On March 4, 2019 at 6:00 p.m., Gerace called TROTTER'S personal cell phone and the two engaged in a 6-minute phone conversation.

| Mar 4 | 6:00 PM | 716.725.1931 | Buffalo, NY | Incoming, CL | 6 |

Later that same evening, at 7:22 p.m., Gerace filed a police report with APD reporting that Phlycia Hunt had stolen his $5,000 Rolex watch and pawned it in Las Vegas.

| AMHERST POLICE<br>POLICE REPORT<br>GRAND LARCENY 3RD | Complaint<br>**19-913390**<br>Report Date & Time<br>3/4/19  19:22 |
| --- | --- |

A few hours after filing the report, at 12:42 a.m. on March 5, 2019, Gerace sent the following text message to TROTTER'S personal cell phone:



> <26644ba439e06e7433b143dab0a1171edc5b0fd0_files_full.zip
> 3/5/2019 12:42:11 AM
> I file a report tonight I went right to the station are young girl blonde hair she took my report

Gerace asked TROTTER if he had seen the report, and TROTTER responded the following day as follows:



> **Greg Trotter (+17165738303)**                    □ Received
>                                                     3/6/2019 8:43:26 PM
> I did not. Jeff Gilbert got assigned the case and will get a hold of you tomorrow or Friday

However, despite Gilbert being assigned to the case, TROTTER told Gerace that he and Gilbert "basically work together" and that he and Gilbert might stop by PGC the following day.

Gerace and TROTTER continued to exchange messages throughout the day on March 6, 2019. During the conversation, Gerace sent TROTTER photos of Gerace's new home, informed TROTTER "you're always welcome at my house you know that," advised TROTTER that Gerace was close with a "Lancaster judge," and invited TROTTER on a golf

trip to Ellicottville along with a local lawyer, a Buffalo police officer and Gerace's cousin, Peter. TROTTER responded that "I know Peter." In total, Gerace and TROTTER exchanged over 40 text messages on the March 6, 2019, 8 of which were sent by TROTTER.

The following day, on March 7, 2019, TROTTER'S personal cell phone records reflect a 6-minute call and a 17-minute call with Gerace:



Later that evening, TROTTER informed Gerace that he was "still working on" getting the Rolex back and asked, "where is the engraving on the watch?"

On March 8, 2019, Gerace followed up with TROTTER, asking about the status of the investigation and whether Gilbert would be arresting Hunt soon. TROTTER responded that he "wasn't there today, I'll talk with [Gilbert] tomorrow." Gerace then informed TROTTER that he "want to make sure [the watch] is still at the pawnshop" and to have Hunt "picked up." TROTTER responded:

> **Greg Trotter (+17165738303)**          ☐ Received
> Can't pick her up till we deal with Vegas          3/8/2019 8:50:23 PM

> **Greg Trotter (+17165738303)**          ☐ Received
> If I find anything out tomorrow I'll let you know          3/8/2019 8:51:00 PM

On March 11, 2019, Gerace informed TROTTER that Hunt allegedly stole more items from Gerace that Gerace had not previously known about. TROTTER responded:

> **Greg Trotter (+17165738303)**                    □ Received
> 3/11/2019 3:19:38 PM
> In court this morning. Pawn shop has a Rolex in their inventory that they are
> shipping to the main store tomorrow. When they get it they will send pictures of
> it to us. No need for a new police report

On March 22, 2019, Gerace and TROTTER exchanged a series of messages about a trip to Florida and Gerace's ex-wife during which Gerace again invited TROTTER to get together socially and have a drink, as follows:

> □ Sent
> **Local User**
> <26644ba439e06e7433b143dab0a1171edc5b0fd0_files_full.zip>
> 3/22/2019 2:38:01 PM
> Have a great time let me know when you get back we'll grab a drink

> **Greg Trotter (+17165738303)**                    □ Received
> 3/22/2019 2:38:11 PM
> Sounds good. Thanks bud

On April 8, 2019, TROTTER called Gerace at 2:52 pm and they spoke for 4 minutes. The two exchanged additional short calls on April 8, 2019 at 6:37 p.m. and 9:14 p.m.

On April 9, 2019, beginning at 12:55 a.m., Gerace sent a series of messages to TROTTER identifying a Grand Island residence where Gerace claimed that TROTTER could find Phlycia Hunt to arrest her. At 12:58 a.m. TROTTER stated, "I'll call you in a couple" and then at 1:52 a.m., TROTTER sent Gerace the following message referring to his arrest of Hunt:

**Greg Trotter (+17165738303)**                                    ☐ Received
                                                                4/9/2019 1:52:05 AM
We have her

Between 1:52 a.m. and 2:41 a.m., TROTTER and Gerace exchanged messages about Hunt, including messages in which it appears that TROTTER is using Gerace to verify information provided by Hunt. At 2:41 a.m. TROTTER informed Gerace that "She'll b[e] spending the night" and later:

**Greg Trotter (+17165738303)**                                    ☐ Received
                                                                4/11/2019 3:21:33 PM
She'll have a court appearance in a couple weeks. You'll probably hear from the da before that and check with them if you can get the watch before court is done.

Gerace followed up with TROTTER about the Hunt case on April 17, 2019, asking for the name of the ADA who had been assigned. TROTTER responded that it "likely hasn't been assigned yet." Gerace then informed TROTTER he was going on a trip and wished TROTTER a happy Easter. TROTTER responded with:

**Greg Trotter (+17165738303)**                                    ☐ Received
                                                                4/17/2019 7:51:50 PM
Same to you. Enjoy your trip ! I put it in my phone to check Friday when the next court date is.

Gerace's phone was seized by law enforcement on April 27, 2019, after which point law enforcement was unable to obtain any additional text message communications between the two.

12

<u>Phlycia Hunt's Arrest and Cooperation with Gerace Investigation</u>

Prior to her arrest in April 2019, Hunt worked at PGC, on and off, since approximately 2008, when Hunt she was eighteen years old.  Hunt first worked at PGC as a dancer and then, when she turned 21, as a bartender.  In addition to working at PGC, Gerace pursued an intimate relationship with Hunt by providing her with alcohol and cocaine while she worked for him at PGC.  After beginning to use drugs with Gerace, Hunt eventually became addicted to cocaine and opiates.  At one point in 2018, Hunt was living with Gerace and stole his Rolex watch and other items before moving to Las Vegas.  While in Las Vegas, Hunt pawned the watch for drug money.  In 2019, Hunt returned to Western New York from Las Vegas.

 Hunt will testify that in the early morning hours of April 9, 2019, she was at a friend's house on Grand Island when two Amherst Police Officers, one of whom was TROTTER, showed up to arrest her.  They arrived at the front door in plain clothes and took her into custody and brought her to the APD station.  Hunt will testify that someone at APD asked her whether she had any information to share and that she had said yes.  Hunt will testify that the following morning, while still in custody at APD, she met with federal investigators.

On the morning of April 9, 2019, HSI SA Curtis Ryan learned that Hunt was in APD custody and had information relevant to the ongoing investigation of Gerace and Bongiovanni.  Ryan traveled to APD and interviewed Hunt, along with DEA SA Anthony Casullo.  SA Ryan learned information related to Gerace and PGC, both of which were targets of an ongoing investigation.  The topics covered included: Hunt's background and relationship with Gerace; Gerace's possession, use, and purchase of controlled substances such as cocaine; associates of Gerace who purchased controlled substances for him (*e.g.*, Jessica Leyland) or provided security at PGC; and Gerace's involvement in prostitution.

13

After Hunt began cooperating with federal law enforcement, Hunt was assaulted by an associate of Gerace's and called a "snitch." In July 2019, Hunt was at a bar with friends when she encountered Gerace's associate, Jessica Leyland. Leyland walked over to Hunt and said that she had heard that Hunt was talking to "the feds," called Hunt a "snitch," and assaulted her by putting her in a headlock.[2] Hunt did not know how Leyland found out Hunt spoke with federal investigators about Gerace.

After the Leyland assault, Hunt was interviewed several more times and also testified in the grand jury. Hunt provided information to law enforcement about Gerace's ties to law enforcement, politicians, and other prominent public figures. Investigators learned that Gerace bragged about knowing federal agents, judges, and law enforcement officers. Investigators learned that on one occasion, on January 28, 2019, Hunt believed that Gerace arranged for a Buffalo Police officer who was a "buddy" of his to come to her apartment to perform a "welfare check" in order to intervene in a dispute between Hunt and her then-husband. Hunt told investigators that she believed Gerace to be friends with many APD officers, which made her apprehensive about calling APD if she felt threatened or scared. Regarding her April 2019 arrest, Hunt will testify that she heard from another individual that the APD detectives that arrested her were friends of Gerace. In approximately October 2019, Hunt was at Gerace's home using drugs he supplied. Gerace discussed Hunt's April 9, 2019 arrest with her and told her that he had his "buddy" arrest her on Grand Island.

---

[2] Leyland was charged in October 2023 with various crimes, including witness tampering in relation to the July 2019 assault of Hunt. Leyland pled guilty to witness retaliation, in violation of 18 U.S.C. § 1513(b)(2) on October 2, 2024.

Federal Investigation and Indictment Period

On April 27, 2019, federal agents seized Gerace's cellphone, which used the number -1931, and shipped the device to SA Ryan with HSI.  SA Ryan worked with his colleagues to extract all of the data on the device, and then returned the device to Gerace's attorney when Gerace demanded it back.  Included in the information found on Gerace's phone were the messages between Gerace (using number -1931) and TROTTER (using numbers -4682 and -8303).

On September 12, 2019, TROTTER had a 9-minute phone call with Gerace.

On October 31, 2019, former DEA Agent Bongiovanni was indicted by a Grand Jury in the Western District of New York.  This garnered significant news coverage, including front page articles in the Buffalo News and other local outlets.  While not mentioned by name, Gerace and PGC were referred to in the indictment as "co-conspirator-1" and "a gentlemen's club operated by co-conspirator-1 in Cheektowaga."  (19-cr-227, Dkt. 1, para. 48). Bongiovanni was charged with conspiracy, obstruction and lying to federal agents for, among other things, falsely denying and covering up his relationship with co-conspirator-1 (Gerace).

On November 5, 2019, TROTTER had a 5-minute phone call with Gerace.

On December 12, 2019, federal agents executed search warrants at PGC and at Gerace's home on Lexor Lane in Clarence, New York.  During the search of Gerace's home, agents found TROTTER'S business card with TROTTER'S APD-issued work cell phone number handwritten on the back.  TROTTER'S title on the card was "Police Officer - Special Victims Unit," a title TROTTER held from 2016-2018 before being promoted to Detective. As with the return of the indictment against Bongiovanni, there was significant news coverage about the search of Gerace's residence and of PGC, including articles that linked these searches to the charges against Bongiovanni.

In February 2020, Gerace obtained a new cell phone number, ending -2076. The phone number was registered to Gerace and connected to PGC by billing address. Somehow, TROTTER obtained Gerace's new phone number and had two lengthy phone calls with Gerace in June and July 2020. On June 24, 2020, Gerace and TROTTER spoke for 11 minutes. On July 10, 2020, Gerace and TROTTER spoke for 7 minutes.

On February 25, 2021, Gerace was indicted and charged, along with Bongiovanni, with conspiracy to defraud the United States and conspiracy to distribute controlled substances. Gerace was also indicted and charged with maintaining a drug involved premises at PGC, and conspiracy to commit sex trafficking by force, fraud and coercion, and related offenses. Again, there was significant media coverage of this second superseding indictment, including front page articles in the Buffalo News and other local outlets.

After February 25, 2021, federal agents continued to investigate the crimes committed by Gerace and Bongiovanni and continued to learn of and seek out additional potential witnesses to their activities. At times it was difficult to obtain information from victims, including former PGC employees, in part because Gerace had publicly and persistently represented that he was "untouchable" and had deep connections in local and federal law enforcement.


F.  TROTTER'S Interview and Lies

On September 30, 2022, FBI Special Agents Jason Kammeraad and Sean Kelley arranged to meet with TROTTER for a voluntary interview. SA Kammeraad arranged to meet TROTTER via telephone call with TROTTER at the number ending -8303.

During the interview, TROTTER was asked how much he knew about the investigation into Bongiovanni and Gerace; TROTTER responded that he only knew

"whatever I've read on the news" and later confirmed that he had "read about it."  TROTTER
stated that he had received a letter from Gerace's attorney and from that inferred that Gerace
wanted to call TROTTER as a character witness.  TROTTER discussed how he met Gerace
in 2016 as a victim in the domestic violence cases, stating that Gerace was "not a friend of
mine.  He was the guy who was a complainant."  TROTTER then engaged in the following
questions and answers:

| SA KAMMERAAD | Do you think the reason he's reaching out to you is simply because of the …you arrested Katrina?   Or does.. I guess what I'm trying to say is Gerace possibly overstating what your relationship is with him and giving that to Cohen and saying hey this guy knows me, this guy, we're friends… |
|---|---|
| TROTTER | I… |
| SA KELLEY | … he would… |
| TROTTER | I don't [know] if Peter would say we're friends… |
| SA KAMMERAAD | Like, oka… |
| TROTTER | Peter's a bug. |
| SA KAMMERAAD | Correct… |
| TROTTER | Like Peter likes to name drop everybody. |
| SA KAMMERAAD | Absolutely. |
| **TROTTER** | **The first time I talked to him he's he's name dropping everybody.  But this was …this started in July 2016.  I think my last interaction with him was January of 2017.** |
| SA KAMMERAAD | Okay |
| TROTTER | But then she, you know, she had drama after that, but nothing that I was involved in. |

A short time later, TROTTER says that "[his] fatal mistake was I called him from my cell
phone . . . and then he had it."

TROTTER discussed being invited to a barbeque at PGC after the East Aurora music
festival.  TROTTER claimed that Gerace invited him to the party in person, stating:

17

| TROTTER | Uhm, so there was…there was one that he had this, uhm, it was like a Blues Barbeque type thing. |
| SA KAMMERAAD | Okay |
| TROTTER | He's like…I mean, I wanted to say that I like saw him somewhere.  He's like hey come, you know, I'm having this blues thing and I was going out to East Aurora music festival |
| SA KAMMERAAD | Okay |
| TROTTER | And I'm like, oh I'll just swing by…. |
| SA KAMMERAAD | Swing by. |
| TROTTER | …to see this blues thing. |
| SA KAMMERAAD | Right |
| TROTTER | And I got there and quite quickly realized that … Michalski was there… |

TROTTER claimed he only stayed at the barbeque for 15 minutes, during which time he said hi to a local judge who was attending the barbeque with his family.  TROTTER also claimed he had been to PGC ten times or fewer, but only once, to the BBQ, at the invitation of Gerace.

TROTTER was asked specifically about the Phlycia Hunt/Rolex case as follows:

| SA KAMMERAAD | Okay.  Uhm, now I know there was based upon the the APD reports, there was a time where a previous…uh, Phlycia Hunt and a Rolex watch? |
| TROTTER | **Oh, yeah.  That wasn't my case.** |
| SA KAMMERAAD | That wasn't your case? |
| TROTTER | No |
| SA KAMMERAAD | Did you work it at all?  Uhm… |
| TROTTER | Yes |
| SA KAMMERAAD | What was your involvement in that case? Cuz I thought I did see your name in some of the reports…. |
| TROTTER | Yeah yeah yeah. No no no, yeah, but it wasn't my case. |
| SA KAMMERAAD | Gotcha |

| TROTTER | It was, uhm, well the guy that I worked with at the time, Jeff Gilbert. He's now retired. |
|---|---|
| SA KAMMERAAD | Okay |
| TROTTER | Uhm, it was his case.  It was assigned to him. |
| SA KAMMERAAD | Okay |
| **TROTTER** | **Uh, my involvement in that was we had to go to Peter's house and have him sign a victim statement.** |
| SA KAMMERAAD | Okay.  Did, uhm, when that case…. |
| **TROTTER** | **And he actually never reached out to me about that case at all.** |
| SA KAMMERAAD | **He never reached out to you?** |
| **TROTTER** | **Cuz I think that was in 2019.** |
| SA KAMMERAAD | Okay |
| TROTTER | yeah |
| | |
| SA KAMMERAAD | Figure out some things.  Uhm, did Gerace go and file the report or did he call you… you said he didn't call … |
| **TROTTER** | **No, he never contacted me about….** |
| SA KAMMERAAD | …or contact you about it? |
| **TROTTER** | **No.** |
| SA KAMMERAAD | Uhm, did you ever have contact with him during the investigation. Like, via phone, email or anything like that? That you can recall. |
| TROTTER | **Not that I can recall.  I I mean I vividly remember going over to his house** |
| SA KAMMERAAD | For that victim statement. |
| TROTTER | To have him sign that |
| SA KAMMERAAD | Right |
| TROTTER | **Sign that statement, but again it wasn't my case. So I didn't really have any involvement in it. I . . . I truly don't remember** |
| SA KAMMERAAD | Okay |
| TROTTER | **But I don't…I don't know what, uhm, cuz Jeff did it all.** |
| | |
| SA KAMMERAAD | And I figured it was you guys just working it together.  But, I just had what was your involvement in that case in particular. |
| **TROTTER** | **Yeah, it was…believe it or not it was actually a surprise that he didn't reach out to me about that case.** |
| SA KAMMERAAD | **Prior to?** |

| | |
|---|---|
| **TROTTER** | **Yeah** |
| SA KAMMERAAD | Okay, Um … |
| **TROTTER** | **Jeff's like I got a report from Peter. I'm like… I just assumed it was something like… oh Jesus, what now.** |
| | |
| SA KAMMERAAD | And just make sure that I've covered everything. Uhm….. When when was the last time that you either saw or spoke with Peter? |
| **TROTTER** | **That day at his house in Clarence.** |
| SA KAMMERAAD | That's the last time? |
| **TROTTER** | **I'm almost positive, yeah.** |
| SA KAMMERAAD | Okay. Uhm, in …. |
| **TROTTER** | **And prior to that it'd been a long time since I had any communication with him.** |

Later in the interview, TROTTER confirmed again that Gerace "never contacted me about that one," referring to the Phlycia Hunt watch case. TROTTER claimed not to remember arresting Hunt or how they knew where Hunt was located. TROTTER further confirmed that he had not spoken to Gerace since taking the statement in the watch case.

## IV.    EVIDENTIARY ISSUES

At trial, the government expects that various evidentiary issues may arise. In this section, the government provides the Court with a high-level overview of those expected evidentiary issues. The government acknowledges that other issues may arise that will require additional briefing or oral argument during trial:

**1. Admissibility of the Defendant's Statements**

Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it is offered against the party and is the party's own statement. Here, the government will

introduce numerous statements made by the defendant, both orally and in writing. The defendant's various statements are admissible as statements by a party opponent. See On Lee v. United States, 343 U.S. 747, 756 (1952); see, e.g., United States v. Meskini, 319 F.3d 88, 93 (2d Cir. 2003); United States v. Inserra, 34 F.3d 83, 90 (2d Cir. 1994); United States v. Clemons, 676 F.2d 122 (5th Cir. 1982) ("A statement is not inadmissible hearsay if it is the statement of a party against whom it is offered.").

When the government admits a portion of the defendant's prior statement, the defendant may not introduce his additional out-of-court statements because such statements are hearsay when offered by the defendant. Fed. R. Evid. 801(d)(2); United States v. Fisher, 15-CR-19, 2017 WL 6047705, at *4 (W.D.N.Y. Dec. 6, 2017) (citing United States v. Kadir, 718 F.3d 115, 124 (2d Cir. 2013)); United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").

Introduction of additional out-of-court statements by the defendant pursuant to the rule of completeness or some other hearsay exception is only permissible where the defendant can identify the statements he seeks to introduce, as well as the legal basis for introducing those statements. Fisher, 2017 WL 6047705, at *4. The rule of completeness, which underlies Federal Rule of Evidence 106, was designed to prevent one party from selectively excerpting statements offered against its opponent to present a distorted impression of the statements to the trier of fact. Beech Aircraft Corporation v. Rainey, 488 U.S. 153, 170-72 (1988). However, the rule of completeness does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." United States v. Jackson, 180 F. 3d 55, 73 (2d Cir. 1999). Rather, a statement need only be admitted under the rule of completeness where (1) failure to do so would "mislead" the jury, United States v. Blake, 195

F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016), or (2) it is necessary "to ensure fair and impartial understanding *of the admitted portion*." <u>Jackson</u>, 180 F.3d at 73 (citations omitted and emphasis added). As such, "[s]elf-serving exculpatory statements . . . are hearsay, and are therefore generally not admissible, unless their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence. Where the danger of such distortion does not exist, however, a defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury through testimony of another witness . . ., while at the same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements." <u>United States v. Harper</u>, 05-cr-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009) (citing <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000)).

The government anticipates working to reach an agreement with counsel for the defendant about the portions of defendant's recorded interview that will be admitted and published to the jury. To the extent no agreement is reached, the government intends to object to defendant playing any portion of the recorded interview not introduced by the government. The government has addressed the specific application of these rules to the September 30, 2022 interview of the defendant in a separate motion in limine.

### 2. <u>Government's Right to Bring Out Information Damaging to Witnesses Called by the Government on Direct Examination</u>

It is well-settled that a party is permitted to minimize the impact of an opponent's impeachment by initiating the impeachment. <u>See</u> <u>United States v. Ewings</u>, 936 F.2d 903, 909 (7th Cir. 1991) ("[M]inimizing the 'sting' of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic") (collecting cases). The government may

bring out information damaging to its witnesses' credibility to prevent the defense from creating the impression that the government is trying to hide something from the jury.  See United States v. Del Purgatorio, 411 F.2d 84, 87 (2d Cir. 1969); see also United States v. Koppers Company, Inc., 652 F.2d 290, 299 (2d Cir. 1981) (prior inconsistent statements); see also United States v. Hasenstab, 575 F.2d 1035, 1040 (2d Cir. 1978) (prior crimes); see also United States v. Livingston, 816 F.2d 184, 191 (5th Cir. 1987) (permitting introduction of impeaching statements in direct testimony).

Here, several of the government's witnesses made statements to law enforcement which may be inconsistent, to varying degrees, with some of their trial testimony. Additionally, some of these witnesses committed prior crimes (some resulting in convictions and some never resulting in arrests) both as a part of their conduct in connection with the charged crimes and also in other contexts.  The government should be permitted to bring out all such information during the direct examination of each witness.

### 3.  Prior Inconsistent Statements

Federal Rule of Evidence 801(d)(1)(A) provides that a statement is not hearsay if:

> The declarant testifies and is subject to cross-examination about a prior statement, and the statement is (A) inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding.

Thus, under this Rule, statements which are inconsistent with the testimony at trial and which were given under oath at a prior proceeding are admissible as substantive evidence.  Here, the government expects that it may, at trial, seek to introduce such evidence as a number of witnesses testified under oath in prior federal grand jury and trial proceedings.

Under this Rule, the government may properly introduce a witness's prior grand jury testimony where such testimony is inconsistent with such witness's trial testimony.  See, e.g., United States v. Murphy, 696 F.2d 282, 284 (4th Cir. 1982); United States v. Marchand, 564 F.2d 983, 997-99 (2d Cir. 1977) (inconsistent prior grand jury testimony admissible under Rule 801(d)(1)(A)); United States v. Mosley, 555 F.2d 191, 193 (8th Cir. 1977); United States v. Rivera, 513 F.2d 519 (2d Cir. 1975).  To be received as substantive evidence under Rule 801(d)(1)(A), the inconsistency between the witness' trial testimony and the former statement need not be in plain terms.  Rather, it is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits, affords some indication that the facts are different from the testimony of the witness on the stand.  United States v. Barrett, 539 F.2d 244, 254 (1st Cir. 1976).

Such evidence may also be introduced where the trial witness forgets or cannot recall that about which he or she testified before the grand jury.  See United States v. Owens, 484 U.S. 554, 558-62 (1988); United States v. Milton, 8 F.3d 39, 47 (D.C. Cir. 1994).

Beyond a witness's prior grand jury testimony, a statement admissible under this Rule may also be in the form of a witness's inconsistent statements during a Rule 11 colloquy, see, e.g., United States v. Lopez, 944 F.2d 33, 41 (1st Cir. 1991), or in the form of a witness's statements made under oath or penalty of perjury at an immigration proceeding.  See, e.g., United States v. Castro-Ayon, 537 F.2d 1055, 1058 (9th Cir. 1976).  While statements made to law enforcement officers conducting interrogation likely do not fall within the scope of the Rule, see, e.g., United States v. Livingston, 661 F.2d 239 (D.C. Cir. 1981) (sworn statement given to postal inspector investigating robbery); United States v. Ragghianti, 560 F.2d 1376 (9th Cir. 1977) (prior statement obtained by FBI in criminal investigation); Martin v. United States, 528 F.2d 1157 (4th Cir. 1975) (statements made to federal agents investigating

firebombing), sworn statements made under such circumstances may unquestionably be used for impeachment purposes. See United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992).

Finally, the use of such evidence does not violate the Sixth Amendment's Confrontation Clause as California v. Green, 399 U.S. 149, 159-61 (1970), plainly teaches. Under Green, any prior inconsistent statement, sworn or unsworn, may come in as evidence of its content so long as the declarant is on the witness stand at the trial and subject at that time to cross-examination.

### 4.  **Prior Consistent Statements**

A witness's prior statements are ordinarily hearsay inadmissible under Federal Rule of Evidence 801. However, under Rule 801(d)(1)(B), a witness's prior consistent statements are not hearsay if they are offered:

> (i)  to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

Fed. R. Evid. 801(d)(1)(B)(i) – (ii).

With respect to subsection (i), the Second Circuit has held that prior consistent statements are admissible so long as they are "made before the declarant developed an alleged motive to fabricate." United States v. Al-Moayad, 545 F.3d 139, 167 (2d Cir. 2008) (internal brackets and citation omitted); see also Tome v. United States, 513 U.S. 150, 158 (1995). Not only are prior consistent statements that meet this requirement admissible, but they are admissible for both substantive and rehabilitative purposes. See Fed. R. Evid. 801 Advisory Committee Note (2014).

Subsection (ii) expands the purpose for which prior consistent statements may be offered to include "the substantive use of prior consistent statements that are probative for rehabilitative purposes other than those specifically enumerated in subsection (i)." United States v. Purcell, 967 F.3d 159, 196 (2d Cir. 2020).  Thus, a prior consistent statement may be used, for example, to rebut an attack on a witness's purportedly faulty memory or to address an apparent inconsistency. See id.

If cross-examination of a government witness includes express or implied charges of recent fabrication, improper influence or motive, or attacks on the witness's credibility, the government intends to seek to admit, where appropriate, that witness's prior consistent statements pursuant to Rule 801(d)(1)(B). Moreover, should such attack on the witness's credibility be argued in the defendant's opening statements, bolstering evidence may be introduced during direct examination of the witness. Cf. United States v. Certified Env't Servs., Inc., 753 F.3d 72, 86 (2d Cir. 2014); United States v. Cosentino, 844 F.2d 30, 33 (2d Cir. 1988) (holding that government may introduce a witness's cooperation agreement on direct examination if the defendant's "opening statement sufficiently implicates the credibility of a government witness").

### 5.  Use of Transcripts

At trial, the government will offer a transcript of the September 30, 2022 interview of the defendant as an aid to the jury.  "Transcripts of tape-recorded conversations may be given to a jury in a criminal trial for the purpose of aiding the jury in following along if certain precautions are taken to ensure accuracy."  United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001).  "If the accuracy of the transcript is contested, competing transcripts may be submitted to the jury."  Id.  Any prejudice arising from the introduction of the transcripts can

usually be avoided by a limiting instruction emphasizing the jury's role as ultimate factfinder. See United States v. Chalarca, 95 F.3d 239, 246 (2d Cir. 1996). Disagreements over accuracy notwithstanding, a district court's admission of a properly authenticated transcript is not reversible error if the defendant is made aware that he is free to submit a competing transcript and does not do so. See Ben-Shimon, 249 F.3d at 102.

Here, the government has prepared a transcript of the September 30, 2022 interview and provided it to defense counsel on May 5, 2025. The government has asked defense counsel to identify any parts of the transcript that counsel believes are not accurate. As of the date of this filing, defense counsel has not identified any such issues.

### 6. **Hostile Witnesses**

Some of the witnesses the government will call in its case-in-chief, such as current and former APD personnel, had (or may still have) relationships with the defendant, and some of these witnesses may exhibit a bias toward the defendant. Because a witness may have interests aligned with the defendant, the witness may be uncooperative and "hostile" on the witness stand. As such, the government may request that it be allowed it to treat such witnesses as hostile witnesses and use leading questions. Rule 611(c) of the Federal Rules of Evidence provides as follows:

(c)    **Leading questions**. Leading questions should not be used on direct examination except as may be necessary to develop the witness' testimony. Ordinarily, the court should allow leading questions:

(1)    . . .

(2)    when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

Under this rule, a "witness identified with an adverse party" is considered a hostile witness as a matter of law and is subject to direct examination by leading questions without any showing of hostility in fact. See Notes of Committee on the Judiciary, Senate Report No. 93-1277: Note 2, Subdivision (c). Indeed, subdivision (c) of Rule 611 significantly enlarged the class of witnesses presumed hostile and subject to direct examination through leading questions without a showing of actual hostility. Haney v. Mizell Memorial Hospital, 744 F.2d 1467, 1477-78 (11th Cir. 1984). A close friend of a defendant has been held to be a witness identified with an adverse party within the meaning of Rule 611(c). United States v. Hicks, 748 F.2d 854, 859 (4th Cir. 1984); United States v. Brown, 603 F.2d 1022 (1st Cir. 1979). Moreover, a prosecutor has broad latitude in questioning a hostile witness and may impeach the witness and argue to the jury that the witness lied. United States v. Zackson, 12 F.3d 1178, 1184 (2d Cir. 1993).

### 7. **Admissibility of Business Records**

The government anticipates offering into evidence various records maintained by the APD and by Verizon.[3] These records are admissible as records of regularly conducted activity pursuant to Federal Rules of Evidence 803(6) and 803(7).

The Second Circuit has stated that "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (internal quotation marks, brackets, and citation omitted). A prerequisite to admissibility is "that the record have sufficient indicia of trustworthiness to be considered reliable." Id. (internal quotation marks and citation omitted). "To lay a proper

---

[3] The government expects to stipulate to the admissibility of most, if not all, of these records. The government, however, provides this summary in an abundance of caution.

foundation for such a record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." Id. (internal quotation marks, brackets, and citation omitted).

While the business record must be regularly maintained, it does not need to be routinely made. See, e.g., United States v. Freidin, 849 F.2d 716, 721 (2d Cir. 1988) ("Nonroutine records made in the course of a regularly conducted business should be admissible if they meet the other requirements of Rule 803(6) unless the sources of information or other circumstances indicate a lack of trustworthiness") (internal quotation marks and citations omitted); see also United States v. Jacoby, 955 F.2d 1527, 1536-37 (11th Cir. 1992) (allowing documents that noted concerns about transactions the defendant was involved with to be admitted as business records even though they were not routinely made, but instead were made from once a week to once a month or even less); Willco Kuwait (Trading) S.A.K. v. de Savary, 843 F.2d 618, 628 (1st Cir.1988).

It is irrelevant whether the witness introducing the document created the document, has personal knowledge of its creation, or simply received and maintained it in the normal course of business. See Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995); Dyno Construction Co. v. McWane, Inc., 198 F.3d 567, 575-76 (7th Cir. 1999).

Where the foundation required under Rule 803(6) is laid, business records are admissible even when the records are incomplete and inaccurate. Claims of inaccuracy and incompleteness are matters going to the weight of the evidence and not its admissibility. United States v. Panza, 750 F.2d 1141, 1151 (2d Cir. 1984); Matador Drilling Company v. Post, 662 F.2d 1190, 1199 (5th Cir. 1981).

8. **Chain of Custody**

At trial, the government will seek to admit, among other things, physical evidence obtained from Gerace's residence. An uninterrupted chain of custody is not a prerequisite to admissibility of an exhibit. United States v. Jackson, 345 F.3d 59, 65 (2d Cir. 2003). "Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence. . ." Id. (citing United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998)). "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction." United States v. Olson, 846 F.2d 1103, 1116 (7th Cir. 1988) (quoting United States v. Aviles, 623 F.2d 1192, 1198 (7th Cir. 1980)).

Proof of the connection of an exhibit to a defendant may be made by circumstantial evidence. United States v. Mendel, 746 F.2d 155, 167 (2d Cir. 1984). "[T]he prosecution need only prove a rational basis from which to conclude that the exhibit did in fact belong to the [defendant]." Id. "The ultimate question is whether the authentication testimony is sufficiently complete so as to convince the court of the improbability that the original item had been exchanged with another or otherwise tampered with." Id.

9. **Charts, Summaries, and Demonstrative Exhibits**

In this case, the government intends to introduce charts/exhibits summarizing voluminous phone records to show interactions and communications between TROTTER and Gerace. Federal Rules of Evidence 1006 and 611(a) govern the use of summaries at trial. Courts have found admitting summary evidence is necessary because it would not be reasonable to expect an average jury to compile summaries and re-create sophisticated flow charts of the voluminous evidence that underlies some cases. United States v. Lasko, 146 F. App'x. 530, 532 (2d Cir. 2005). Rule 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Rule 1006 permits the introduction of summaries in a variety of forms, including recordings, photographs, charts and calculations. Summaries introduced under Rule 1006 are themselves evidence and can be reviewed by jurors in the deliberation room just like any other piece of admitted evidence. See United States v. Pinto, 850 F.2d 927, 935-36 (2d Cir. 1988). Although the underlying original documents upon which the summaries are based must be admissible, they do not have to be received into evidence. See Weinstein's Federal Evidence § 1006. The requirements to admit the summary include making the originals upon which the summary is based available to the opposing party. The underlying original documents must themselves be admissible and the proponent who offers the summary must be able to authenticate it. *See* United States v. Bray, 139 F.3d 1104, 1109-11 (6th Cir. 1998). Authentication of the chart only requires the witness (1) has properly catalogued the exhibits and records upon which the chart is based; and (2) have knowledge of the analysis of the records referred to in the chart. United States v. Scales, 594 F.2d 558, 563 (6th Cir. 1979). A proper foundation must be established "connecting the numbers on the chart with the underlying evidence." United States v. Citron, 783 F.2d 307, 316 (2d Cir. 1986). Prior to use at trial, the Court must determine that the summary charts "fairly represent and summarize the evidence upon which they are based." Id. (citation omitted).

Here, all of the phone records that will underly the government's exhibits have been previously provided to the defendant. Accordingly, the government should be permitted to introduce summary charts pursuant to Rule 1006.

At trial, the government may introduce charts as a demonstrative aid to the jury. These charts will demonstrate or summarize evidence already admitted during the course of the trial. Allowing the use of charts as "'pedagogical' devices intended to present the government's version of the case" is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a). United States v. Posada-Rios, 158 F.3d 832, 869 (5th Cir. 1998). Such demonstrative aids are typically permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence and do not go to the jury room absent the parties' consent. See United States v. Taylor, 210 F.3d 311, 315 (5th Cir. 2000); see also United States v. Martinez, 1998 WL 613572, at *5 (2d Cir. 1998) (demonstrative aid admitted in court's discretion.

## 10. Prior Convictions of Government Witnesses

At least one of the government's anticipated trial witnesses has prior criminal convictions. This memorandum is submitted in support of the government's position that some of the witness's prior convictions are inadmissible for impeachment purposes.

In general, defense counsel has no right to cross-examine a government witness about unrelated events. United States v. Marji, 158 F.3d 60, 63 (2d Cir. 1998) (limiting defense counsel's attempt to impeach a key government witness by introducing wholly unrelated events did not in any way constitute an abuse of discretion). Rule 611(b) provides that cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.

The impeachment of witnesses with prior convictions is governed by Federal Rule of Evidence 609. Pursuant to Rule 609(a)(1), felony convictions not more than 10 years old (calculated from release from imprisonment) are generally admissible for impeachment

purposes.[4]  Pursuant to Rule 609(a)(2), however, misdemeanor convictions, also not more than ten years old, are admissible only if they "involved dishonesty or false statement." Further, pursuant to Rule 609(d), except under limited circumstances, juvenile adjudications are not admissible.  United States v. Canniff, 521 F.2d 565, 569-70 (2d Cir. 1975).

Misdemeanor convictions are usable for impeachment purposes only if they "bear directly on the likelihood that the [witness] will testify truthfully."  United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977) (emphasis added).  Such convictions must be in the nature of perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense to be admissible for impeachment purposes.  Id. at 827.  Misdemeanor convictions for such things as petite larceny and assault, Id.; United States v. Fearwell, 595 F.2d 771, 776-77 (D.C. Cir. 1978), possession of narcotics, United States v. Millings, 535 F.2d 121, 123 (D.C. Cir. 1976), prostitution, United States v. Mansaw, 714 F.2d 785, 789 (9th Cir. 1983), and traffic violations, Gordon v. United States, 383 F.2d 936, 940 (D.C. Cir. 1967), however, are not admissible.

Rule 608(b)(1) permits a defendant to cross-examine a witness about specific instances of conduct that are probative for truthfulness.  The questioner must have a good faith basis for the question, see United States v. Abair, 746 F.3d 260, 264 (7th Cir. 2014), and the test is whether the questioner possesses facts that would support a genuine belief.  See United States v. Whitmore, 359 F.3d 609, 621-22 (D.C. Cir. 2004).  Extrinsic evidence for impeachment purposes is prohibited under this rule.

---

[4] The ten-year limitation is set forth in Federal Rule of Evidence 609(b).  This time period is measured as of the date the witness testifies.  See United States v. Brown, 409 F. Supp. 890, 894 (W.D.N.Y. 1976).

11. **Judicial Notice**

Pursuant to the doctrine of judicial notice and Rule 201 of the Federal Rules of evidence, if requested by a party, the Court must take judicial notice of any undisputed facts, if supplied with the necessary information, which are either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. The government will ask the Court to take judicial notice that the Federal Bureau of Investigation and the Department of Homeland Security are agencies or departments of the United States of America.

12. **Stipulations**

Government counsel and defense counsel have not yet discussed stipulations to certain evidence in this case. In the event stipulations are reached, the parties will advise the Court accordingly consistent with the Court's Pretrial Order.

13. **Witness Sequestration**

The government requests pursuant to Federal Rule of Evidence 615 that the Court order that witnesses be excluded from the courtroom so that they will not hear the testimony of other witnesses. The government asks, pursuant to Rule 615(b), that FBI Special Agent Brian Burns be exempted from the sequestration order even though he will testify.

Sequestration of witnesses is to be virtually automatic unless they fit within one of the exemptions in Rule 615. United States v. Jackson, 60 F.3d 128, 135 (2d Cir. 1995). If there is opposition to the order to exclude a witness from the courtroom, the party opposing it bears the burden to demonstrate why an exemption to the exclusion applies, and the party seeking

exclusion is to be given an opportunity to demonstrate that it is appropriate.  Id. at 135-37; see also, generally, United States v. Rivera, 971 F.2d 876, 889-90 (2d Cir. 1992).  We do not expect that the defendant will oppose a sequestration order.

### 14. **Other Issues**

The government hereby requests to reserve its right to submit supplemental memorandum to the Court on evidentiary issues should the need arise after the filing of this pretrial brief.  This request is based on the fact that prior to trial there may be additional evidentiary issues of which the Court should be made aware.

## V.    DISCOVERY DEMAND

The Magistrate Court granted the government's motion for reciprocal discovery pursuant to Federal Rule of Criminal Procedure 16(b). *See* Dkt. 28 at 15. As of the date of this memorandum, the government has not received any discovery from the defendant.  To the extent that there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that the defense has not produced, the government reserves the right to seek to have such materials excluded at trial. See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the

government's case-in-chief in order to affirmatively support the defendant's theory of the case,

such a document falls within the ambit of Rule 16. As explained in United States v. Hsia,

No. 98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Id. The Hsia court distinguished documents introduced by a defendant via a government

witness—which do fall within Rule 16 and should be disclosed—from documents used by a

defendant "merely to impeach a government witness, and not as affirmative evidence in

furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-

chief." Id. at *2 n.1.

Courts in the Second Circuit and elsewhere have held that the defense must produce

in advance any "exhibit that will not be used *solely* for impeachment purposes," even if the

defense intends to introduce such exhibit during cross-examination of a government witness.

United States v. Chen et al., No. 22-CR-158 (ENV), Dkt. 366 (Oct. 17, 2024) (directing

defendants to disclose such material even if it was produced by the government in discovery);

United States v. Smothers, 652 F. Supp. 3d 271, 308 (E.D.N.Y. 2023); see also United States

v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017)

(holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they

intend to use in their defense at trial, whether the exhibits will be introduced through a

government witness or a witness called by a Defendant."). That obligation extends to material

produced by the government in discovery that the defense intends to use as an exhibit. See

Smothers, 652 F. Supp. 3d at 308 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody"). Numerous other district courts have interpreted Rule 16(b) similarly. See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes."); United States v. Holden, No. 13-CR-444, 2015 WL 1514569, at *4 (D. Or. Mar. 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose nonimpeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 2:12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same); United States v. Huntress, No. 13-CV-199S, 2015 WL 631976, at *34, n.1 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests").

Here, to date, the defendant has not disclosed any document he intends to introduce at trial. Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendant to identify any exhibits he intends to introduce during the government's case or any defense case no later than May 19, 2025, consistent with the Court's Pretrial Order. See Dkt. 44 at 4.)

In addition, the government respectfully submits that, to avoid delay in the upcoming trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendant himself. See Fed. R. Crim. P. 26.2. The government proposes that

Rule 26.2 material should be provided along with the defendant's witness list on May 19, 2025.

The defendant has not given notice of intent to rely on any defense of entrapment, mental incapacity, duress, or alibi. Therefore, to the extent the defendant may attempt to rely on any such defense, the government reserves the right to object and to seek to have the defendant precluded from asserting such defenses.

DATED:  Buffalo, New York, May 12, 2025.

MICHAEL DIGIACOMO
United States Attorney

BY:     s/DOUGLAS A. C. PENROSE
        Assistant United States Attorney
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, New York 14202
        (716) 843-5868
        Douglas.Penrose@usdoj.gov

BY:     s/EVAN K. GLABERSON
        Assistant United States Attorney
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, New York 14202
        (716) 843-5871
        Evan.Glaberson@usdoj.gov